**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **CASE NO. 22-cr-00054-TNM** |
| | : | |
| **SHAWN CORTEZ MOSES,** | : | <u>UNDER SEAL</u> |
| **Defendant.** | : | |

<u>**UNITED STATES' SENTENCING MEMORANDUM**</u>

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this memorandum to aid the court in sentencing the defendant, Shawn Cortez Moses. For his offenses, the United States requests a sentence of 168 months of incarceration, followed by a lifetime of supervised release. The government also seeks restitution in the amount of $100,000 on behalf of the minor victim in this case. Such a sentence balances the factors outlined in 18 U.S.C. § 3553(a), and is "sufficient, but not greater than necessary to comply with the purposes" of sentencing.

**I.    <u>Background</u>**

Between approximately June of 2017 and June of 2018, the defendant made the decision to sexually assault a child, who was between the ages of six and seven when this horrific event occurred. Before the age of 10, this little girl was subjected to sexual abuse not only at the hands of the defendant, but also to recurrent sexual abuse by ▉▉▉▉▉▉ (hereinafter DEFENDANT 1). DEFENDANT 1 allowed at least two other men to come to the home ▉▉▉▉▉▉▉▉ ▉▉▉▉ to sexually assault the defenseless child as DEFENDANT 1 filmed the abuse.[1]  Instead

---

[1] Each of the individuals identified as having sexually abused Minor Victim 1 was charged in a separate case.

1

of being safe, protected, and cared for by ▮▮▮▮▮, Minor Victim 1 was treated as an object of sexual gratification by this group of adults.  Compounding the trauma that this little girl has endured, ▮▮▮▮ chose to upload these videos to a cloud storage account, permanently memorializing the deplorable way in which this little girl was violated and betrayed.

In April of 2020, Minor Victim 1 was removed from the home of ▮▮▮▮ after law enforcement received a tip that DEFENDANT 1 distributed sexually exploitive images of the little girl, including images depicting the ▮▮▮ abuse of the child by DEFENDANT 1.  As part of the investigation, law enforcement seized multiple electronic devices from the home and arrested DEFENDANT 1.  As the investigation continued, law enforcement recovered numerous images depicting the sexual abuse of children, including Minor Victim 1, from DEFENDANT 1's cellular phone and from her Dropbox account.

Among the numerous images uploaded to DEFENDANT 1's Dropbox account was a series of three videos depicting the defendant sexually abusing Minor Victim 1.  The three videos, which appear to have all been filmed during the same incident, were uploaded to Dropbox on June 24, 2018, and depict the defendant inside of ▮▮▮▮▮▮▮▮▮, with Minor Victim 1.  The angle of the video suggests that the camera was being held up by someone immediately behind the defendant.  Indeed, DEFENDANT 1 later acknowledged that she used either a cellular phone or tablet to film the sexual abuse.  The videos depict the defendant sexually abusing this little girl in the following manner:

(1) VID_20180624_215654: This video displays the defendant, with a distinctive mark visible on his upper back, rubbing his erect penis against Minor Victim 1's bare vulva and anus.

(2) VID_20180624_220435: This video shows the defendant with a sex toy penetrating his anus.  The camera then pans forward, and the defendant can be seen putting his mouth on Minor Victim 1's vulva and anus.

(3) VID_20180624_220943: This video shows the defendant penetrating Minor Victim 1's vulva with his tongue and putting his mouth on the child's anus. DEFENDANT 1 can be heard in the background directing the defendant on what he should do to the child.

The defendant was approximately 25 to 26 years old at the time of the offense, nearly twenty years older than the victim.

In the course of the investigation, law enforcement learned that the defendant and DEFENDANT 1 met online in 2017 or 2018.  Approximately six months later, they met in person and began a sexual relationship.  At times they engaged in sexual activity in DEFENDANT 1's Washington, D.C. residence.  DEFENDANT 1 routinely video-recorded the consensual sexual activity between herself and the defendant, and the two adults would view the video-recorded material together as a standard part of their sexual relationship.  It is the government's position that the defendant knew that DEFENDANT 1 was filming him at the time he sexually assaulted Minor Victim 1.  The defendant later viewed at least one video-recording that DEFENDANT 1 had taken of him sexually abusing the child.  That video was one of the videos uploaded to Dropbox on June 24, 2018.

The investigation also led to evidence of messages exchanged on KIK between the defendant and DEFENDANT 1.  In those messages, they discussed engaging in sexual acts with each other, and attempted to schedule time for the defendant to visit DEFENDANT 1.  The messages also strongly suggest that the defendant was at least curious, if not interested, in a sexual encounter with Minor Victim 1.  In one message, the defendant asked DEFENDANT 1 for a picture

of Minor Victim 1 and DEFENDANT 1 responded by sending him a media file that was deleted

from the KIK messages by the time law enforcement recovered them.  The following messages

were exchanged after the deleted file was sent:

> SAXMOSES24: I wanna fill her up with my dick so bad[2]

> DEFENDANT 1: U must be awesome to ▇▇▇ in order to get a moment with her again

> SAXMOSES24: Okay ▇▇▇…Good night.

On June 9, 2022, the defendant entered a plea of guilty and accepted responsibility for his

sexual abuse and exploitation of Minor Victim 1.  The United States now asks that the court impose

a sentence of 168 months of incarceration, to be followed by lifetime supervised release, and

restitution in the amount of $100,000.  Such a sentence appropriately balances the § 3553(a) factors

and is commensurate with the sentence imposed in the related case of *United States v. Christopher

Ham*, 21-cr-665-TNM, which will be discussed more fully below.

## II.    A Sentence of 168 Months Accurately Reflects the § 3553(a) Factors

In determining a reasonable sentence, the Court must consider the factors listed in 18

U.S.C. § 3553(a).[3]  These factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed –

---

[2] The United States contends that in the context of the overall Kik exchange, the reference to "her" by defendant Moses is reasonably read as referring to his interest in sexual contact with the minor child.  The defendant disputes this interpretation.

[3] "Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005), the Guidelines serve only an advisory function. *Id.* at 245, 125 S. Ct. 738. Nevertheless, even in a post-*Booker* world in which the Guidelines are not binding, the sentencing court 'must calculate and consider the applicable Guidelines range" as its starting point. And *Booker* did not change "how the Guidelines range is to be calculated." *United States v. Mattea*, 895 F.3d 762, 766 (D.C. Cir. 2018) (internal citations and quotations omitted).

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and

(3) the kinds of sentences available;

(4) the applicable sentencing guidelines range for the offense;

(5) pertinent policy statements issued by the U.S. Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); *see also United States v. Pyles*, No. CR 14-00006 (RJL), 2020 WL 376787, at *2 (D.D.C. Jan. 23, 2020); *United States v. Mitchell*, No. CR 05-00110 (EGS), 2019 WL 2647571, at *7 (D.D.C. June 27, 2019). A district court, however, "need not consider every § 3553(a) factor in every case." *In re Sealed Case*, 527 F.3d 188, 191 (D.C. Cir. 2008); *see also United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017).

### A. The Nature and Circumstances of the Offense

The defendant's sexual abuse of a defenseless little girl – which was then recorded and will serve as a permanent memorialization of the abuse and betrayal she endured – is among the most serious criminal offenses. The damage caused by this defendant's behavior is exacerbated by the fact that this defendant engaged in "play" with Minor Victim 1 shortly before the abuse,[4] thereby forever connecting the joy of healthy childhood play with the emotional poison of sexual abuse.

Child sexual abuse is a "crime of violence," in the District of Columbia, even where it does not include physical force or threats, reflecting the reality that many child sexual abuse victims experience the same long-term trauma as victims of other types of violence, even when their bodies

---

[4] The defendant was video recorded playing with a dollhouse with the child as she sat on the floor almost nude. There are additional still images of the defendant bathing the child. ▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓  *See* Gov't Ex. 1, Berlin, Dr. Fred S., *Evaluation of Shawn Moses*, June 22, 2021, at 10.

do not bear any visible scars.  D.C. Code § 23-1331(4).    While the full extent of the damage suffered by Minor Victim 1 is not known at this stage of her young life, she is likely to suffer the consequences of the defendant's sexual abuse for years to come.  *See generally,* ███████████ ████████████████████████████████████ (previously filed under seal with the Court).  The absence of visible injury does not mean that this defendant did not cause long-term damage to a defenseless child.

> Sexual victimization, such as [Minor Victim 1] was subjected to, is an adverse childhood experience that will have effects not limited to effects on [Minor Victim 1's] emotional wellbeing during childhood.  This type of injury has the potential for impacting her global sphere of functioning and how she relates to herself and others for many years to come.

*Id.* at 10.

One particularly damaging aspect of the defendant's abuse is the fact that he engaged in playing with the child and acting as a caretaker in and around the time that he also sexually abused her.  This is confirmed in a video recovered from DEFENDANT 1's cell phone that appears to have been filmed in ██████████████████████.  In this eight-second video, the defendant is seated on the floor wearing only a black pair of underwear with white-colored spots.  The child, who appears to be approximately 6 or 7 years old, is almost nude, with a black hairnet covering her hair.  In the brief video it is unclear whether the child is even wearing underwear.  In the video, the two play with a pink plastic dollhouse filled with toys, which is sitting in between them on the floor.  The defendant can be heard asking, "Where are you sleeping tonight?"  The child, who is smiling and clearly enjoying the playtime, jumps up from the floor and runs out of the room. ███ ████████████████████████████████████████████████████ *See Berlin*, at 10.  As ███████ notes, the play-abuse pairing can enhance the damage caused by abuse because:

> Play is a very important function of healthy child development.  Play is engaged in by children universally to learn, develop, master skills, and to build socialization

capacities.  Play is also held sacred in both childhood *and* adulthood as an outlet for enjoyment, fulfillment and joy. The act of engaging a child in play, only to subsequently abuse, victimize and exploit said child can essentially create an extremely confusing and frightening pairing of a play-abuse relationship in the child's growing understanding of commonplace interactions and bonding.

*Id*. at 9.  The play-abuse pairing that the defendant engaged in with Minor Victim 1 not only damaged the child's potential for healthy development, but simultaneously destroyed one potential avenue of healing for her by limiting the clinical value of "play therapy" in the future.  *Id.* at 9. In addition to specifically playing with Minor Victim 1, the defendant also feigned caretaking by bathing the child, while DEFENDANT 1 took photographs.  In three additional images recovered from DEFENDANT 1's phone, an adult male with the defendant's build can be seen leaning over a bathtub while Minor Victim 1 stands in the bathtub completely nude.  The adult male is wearing the same black underwear with white-colored spots that can be seen on the defendant in the video depicting the dollhouse.  The images include: (1) a photograph of the nude child standing in the bathtub; (2) an image with the adult male placing a sponge on the child's pubic area; and (3) an image with the child standing with her buttocks directly in front of the face of the adult male.

As              reports, it may take Minor Victim 1 upwards of 15 years of psychotherapy and related services to address the residual impact of the childhood sexual abuse she was forced to endure.  *Id.* at 13-18.  These potential injuries include a host of both mental and physical ailments that frequently attend childhood sexual abuse, including dissociation, increased risks of alcoholism, drug abuse, depression, suicide attempts, smoking, an increase in sexual partners and sexually transmitted diseases, and sever obesity.  *Id.* at 8-10.  Further, adverse childhood events, including sexual abuse, are interrelated with serious health conditions later in adulthood, including "ischemic heart disease, cancer, chronic lung disease, skeletal fractures, and liver disease."  *Id.* at

10.  As such, the defendant contributed to putting this little girl on a lifelong course of facing down numerous mental health and physical challenges.

specific findings related to Minor Victim 1 are supported by broader research on the effects of sexual abuse on a developing child.  Studies suggest that early trauma, including sexual abuse, may interfere with brain development, and can produce various neuropsychiatric symptoms commonly associated with drug use.  *See* Anderson, C. M., Teicher, M. H., Polcari, A., & Renshaw, P. F.  (2002):  Abnormal T2 relaxation time in the cerebellar vermis of adults sexually abused in childhood: Potential role of the vermis in stress-enhanced risk for drug abuse.  *Psychoneuroendocrinology, 27*, 231-244;  Baynard, V. L., Williams, L. M., & Siegel, J. A.  (2001): The long-term mental health consequences of child sexual abuse: An exploratory study of the impact of multiple traumas in a sample of women.  *Journal of Traumatic Stress, 14*(4), 697-715 (noting that child sexual abuse victims reported a lifetime history of more exposure to various traumas and higher levels of mental health symptoms).  Other studies have found that individuals who suffer sexual abuse in their childhood years have a higher rate of anxiety, disruptive behaviors, substance abuse, and personality disorders compared to others who may have experienced other forms of abuse or neglect.  *See* Cohen, P., Brown, J., & Smailes, E. (2001):  Child abuse and neglect and the development of mental disorders in the general population.  *Development and Psychopathology, 13*, 981-999; Dube, S. R., Anda, R. F., Felitti, V. J., Chapman, D. P., Williamson, D. F., & Giles, W.H.(2001): Childhood abuse, household dysfunction, and the risk of attempted suicide throughout the life span: Findings from the adverse childhood experiences study.  *JAMA, 286*(24), 3089-3096 (noting that a powerful relationship exists between adverse childhood experiences and risk of attempted suicide through the life span); Merrill, L. L., Thomsen, C. J., Sinclair, B. B., Gold, S. R., & Milner, J. S.  (2001):  Predicting the

impact of child sexual abuse on women: The role of abuse severity, parental support, and coping strategies. *Journal of Consulting and Clinical Psychology, 69*(6), 992-1006 (child sexual abuse is a significant predictor of long-term psychological difficulties ranging from depression and anxiety to sexual problems and dissociative symptomatology).   Research also indicates that sexually abused adolescents are at an increased arrest rate for sex crimes and prostitution and are at an increased risk for earlier pregnancy.  *See* Putnam, F. W.  (2003):  Ten-year research update review: Child sexual abuse.  *Journal of the American Academy of Child and Adolescent Psychiatry, 42*(3).

Additionally, survivors of childhood sexual abuse often experience intense feelings of guilt and shame that can affect their capacity to develop meaningful present and future relationships, and can result in more guarded and cautious interactions with peers and other adults. *See* Raymond E. Webster, Symptoms and Long-Term Outcomes for Children Who Have Been Sexually Assaulted, 38 Psych. in the Schools 533, 536–39 (2001). These children often develop symptoms associated with post-traumatic stress disorder (PTSD), including general agitation, behavior disorganization, and frightening nightmares. *Id.* at 537. Children who are particularly young or rely on the perpetrator for things like emotional support can suffer particularly severe trauma that intensifies their fears, causes emotional confusion, and impedes their ability to trust others. *See id.* at 538–39.  Minor Victim 1 has already exhibited the trauma and confusion typical in such a situation, as ▮▮▮▮▮ described:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ of Minor Victim 1, previously filed under seal.

Although family support and parental understanding can mitigate some of these long-term issues, the trauma of abuse can also "overwhelm" even "an essentially healthy functioning child who resides in a reasonably well-functioning home because [it] can disrupt the primary protective factors (such as friends, caretakers, extended family, familiar neighborhood) that protected the child initially." Webster, Symptoms and Long-Term Outcomes, at 540.  This is particularly acute here where Minor Victim 1 lived in an abusive environment ⬛⬛⬛⬛⬛ for the majority of her life, and then had to transition ⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛ The transition, as described by Minor Victim 1's ⬛⬛⬛ in his ⬛⬛⬛⬛⬛ previously filed under seal, has been incredibly difficult for Minor Victim 1 and her family. For all of these reasons, a guidelines sentence of 168 months of incarceration, followed by lifetime supervised release, will reflect the gravity of the defendant's conduct and the long-term harm that he has caused to a defenseless little girl.

### B.  History and Characteristics of the Defendant

Defendant Moses is a college-educated, 28-year-old man, with a limited criminal history. He was earning approximately $75,000 annually at the time of his arrest.  Presentence Investigation Report ("PSR")¶ 13. He grew up in a stable home with two loving parents who provided for his needs, took him to church, and gave him ample educational and social opportunities throughout his life.  *Id.* at ¶¶ 11-12. ⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛ *Berlin*, at 6.  Given the defendant's upbringing, education, and life opportunities, it is difficult to comprehend why he chose to engage in the violent abuse and degradation of a child in the pursuit of his own sexual fulfillment.  Surely the defendant was aware of the wrongfulness of his conduct at that time, and he had every opportunity to make

a different choice when DEFENDANT 1 ▓▓▓▓▓▓▓▓▓▓ to sexually abuse ▓▓
▓▓▓▓

Despite the defendant's limited criminal history, educational attainment, and prior work experience, the Court should not consider varying from the Sentencing Guidelines.  With respect to the defendant's limited criminal history, this aspect of his history is already built into the Sentencing Guideline's calculation.  Thus, the court should not rely on this as a rationale to vary from a Guideline's sentence. To do so would inappropriately enhance the importance of a factor already fully taken into account by the Sentencing Guidelines.

While the defendant does not have any prior convictions, it is significant for purposes of sentencing in this case that his prior contact with the criminal justice system also involved sexually deviant behavior.  In D.C. Superior Court case 2014-CMD-015501, the defendant was arrested and charged with sexual solicitation after arranging with an undercover officer to receive oral sex in exchange for $4.00.  The defendant successfully completed a diversion program related to the offense and the United States entered a *nolle prosequi* in the case on March 3, 2015.  Despite having this opportunity to change course and to alter his behavior in 2014, the defendant continued seeking out sexual gratification irrespective of the legality of his conduct.  The sexual abuse of Minor Victim 1 is rightly viewed as an escalation of his conduct in 2014.  In both cases the defendant demonstrated a willingness to engage in any behavior – illegal or not – to satisfy his sexual desires.  Considered in that light, it is particularly disturbing that the defendant now appears to minimize his conduct related to his 2014 arrest, chalking it up to boredom or a joke.[5]  That same

---

[5] Dr. Berlin reported the defendant's version of the incident as follows:

minimization is evident in the way that the defendant describes his role in the instant offense, deflecting blame and responsibility away from himself and describing himself as someone who merely followed the instructions of DEENDANT 1.

In considering the defendant's prior history, the lack of prior conviction specifically related to the sexual abuse or exploitation of a child is only of minimal value in understanding the defendant's ongoing danger to the community. This is because the online sexual exploitation of children, as well as the hands-on sexual abuse of children, is a crime that is typically committed in secret. This secrecy, combined with the overwhelming presence of digital devices and the near universal access to the internet, makes detection of these criminal offenses difficult. In the present case, the defendant's abuse of this vulnerable little girl was not detected for almost three years until he was caught by law enforcement. Even after the abuse occurred, the defendant engaged in Kik messages with DEFENDANT 1, described above, which the United States contends demonstrates his interest in additional sexual contact with the child. Both the sexual abuse and the messages remained a secret until the arrest of DEENDANT 1. Had DEFENDANT 1 not been caught, the repeated sexual abuse of this child may have remained a secret indefinitely, leaving Minor Victim 1 at risk of additional abuse by the defendant and others for years to come.[6]

When fashioning the appropriate sentence in a child exploitation offense, a minimal arrest record should be viewed with caution, because it is well-known that children often do not disclose



*Berlin*, at 7.

[6] To date, Minor Victim 1 has never disclosed the sexual abuse ▮▮▮▮▮▮▮▮▮▮ to law enforcement. The government is not aware of Minor Victim 1 ever reporting the abuse to a mandated reporter or to any other person in a position to intervene.

sexual abuse, and that these types of crimes are wildly underreported. *See United States v. Gregory Todd Numan*, 3:160cr000065(TMB)(DAK)(February 26, 2018:  Expert Testimony of Clinical Psychologist Darrell Turner). This is exactly the situation that has unfolded in this case with Minor Victim 1.   In *Numan*, Dr. Turner provided expert testimony to the Court to explain why a reliance on the lack of prior criminal history of an offender charged with sexual offenses committed against children does not serve as a reliable indicator of their future risk for reoffending.  As explained by Dr. Turner:

> "One of the main problems is the fact that these offenses are among the most undetected offenses that there are. This is not like bank robbery or murder, where it's generally assumed and expected that it's going to be detected and reported. We know from research that about only about five percent of sexual offenses against children are ever reported.
>
> Of those, of that five percent, about another five percent result in a conviction. So we're talking about an exponentially small number of offenses that are reported and accounted for.
>
> So it's sort of akin to saying there were only four drunk people in New Orleans in Mardi Gras this year because there were only four arrests for public intoxication, and it's not a good representation of what's actually going on out there. So to say it without the qualifier that, hey, this is a gross underestimate, but you know, so far, this is what we've been able to find, I think, is misleading and very, very dangerous."

at pages 22-23.  *See also* K. London, M. Bruck, S. J. Ceci & D. W. Shuman, *Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways Children Tell?*, 11 PSYCHOLOGY, PUB. POL'Y & L. 1, 194-226 (American Psychological Association, 2005)(finding in a study of adult retrospective victim studies about child sex abuse, approximately 60 – 70% of adults sexually abused as children did not recall disclosing the abuse during childhood); *See also* D. W. Smith, E. J. Letourneau, B. E. Saunders, D. G. Kilkpatrick, H. S. Resnick & C. L. Best, *Delay in Disclosure of Childhood Rape: Results from a National Survey*, 24 CHILD ABUSE & NEGLECT 2,

273-87 (2000)(the results of the study found that only 12% of child rape victims' assaults were reported to law enforcement authorities.).  As such, given the ways in which these types of crimes are committed and the reluctance and inability of the victims to disclose, the defendant's limited criminal history should be given less weight by the Court when determining the appropriate sentence.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and Provide Just Punishment for the Offense

This factor is known as the "just desserts" concept, answering the need for retribution so that the punishment fits the crime and the defendant is punished justly.  *See United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010).  The *Irey* court cited the Senate Report regarding this provision:

> This purpose--essentially the "just desserts" concept--should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct.  From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense.  (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59).

*Id.*

As described above, the sexual abuse and exploitation of children are offenses that have lifelong, devastating consequences for the victims.  With respect to 18 U.S.C. § 3553(a)(2)(A), a Guidelines sentence of 168 months would provide "just punishment" for his offenses, promote respect for child sexual abuse and exploitation laws, and reflect the seriousness of his offenses and offenses against minor victims in general.

### D. The Need for the Sentence Imposed to Afford Adequate Deterrence

"Sentences influence behavior, or so at least Congress thought when, in 18 U.S.C. § 3553(a), it made deterrence a statutory sentencing factor." *United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007).  Congress, the Supreme Court, and the Sentencing Commission have

demonstrated that general deterrence is a very important factor when considering an appropriate sentence. *See United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017) (the sentence would deter Fry and "others who may be inclined in doing similar kinds of things."); *see also United States v. Ferber*, 458 U.S. 747, 760 (1982). A sentence of 168 months is a lengthy, but just, sentence that would support Congress's aim of generally deterring the sexual abuse and exploitation of other children. Such a sentence demonstrates that federal courts take child sexual abuse and exploitation seriously and that offenders will be held to account for the long-term damage that they cause to their vulnerable victims.

Deterrence is a particularly important factor in a case such as this where the defendant attempts to minimize his behavior by asserting that he only committed this offense because DEFENDANT 1 told him to. Notably, during an interview with Dr. Berlin, the defendant claimed

*Berlin,* at 10.

*Id.* at 10. According to the defendant, he abused the little girl because he was concerned that DEFENDANT 1 since she had previously

*Id.* at 10. At its core, the defendant's explanation about why he chose to abuse a child revolves around his desire to avoid personal embarrassment related to his sexual preferences. He makes no claim that he was forced or threatened into abusing the child. He only acknowledges that he did not want DEFENDANT 1 to do something but otherwise lawful, sexual conduct.

The defendant's admissions demonstrate how important the deterrent effect of a significant sentence can be in similar situations.  The defendant was readily led into committing a violent criminal act by someone who, at most, exerted only a minimal amount of personal pressure on him to do so.  Even after perpetrating the offenses that bring him before the Court for sentencing, the defendant continued his relationship with DEFENDANT 1 and even met her to have ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ demonstrating absolutely zero concern for the wellbeing of the child.  *Berlin*, at 10.  For individuals like Moses, and others, who are so easily led into committing horrific crimes, the prospect of a significant sentence may be the only protection afforded a vulnerable child who is offered up to someone weighing the choice of whether to participate in the sexual assault of a child for their own sexual gratification or making the right decision to walk away and report the encounter to law enforcement.  The fact that this defendant was so easily swayed into such egregious conduct should give this Court grave concern for what will happen the next time this offender finds himself in a similar situation. Potential offenders must know that a weighty sentence awaits if they do not walk away. A sentence of 168 months here would serve that protective purpose.

### E. The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant

In fashioning a sentence, the Court should wholly disregard the unsupported conclusions of Dr. Fred S. Berlin, who opines that the defendant's ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Berlin*, at 14.  In the first instance, Berlin's subjective conclusions are unsupported by any of the widely used and scientifically accepted clinical tests that are typically employed by professionals to objectively evaluate individuals who may present as sexually dangerous.  For example, when evaluating sex offenders, a prudent clinician may rely on a variety of professionally accepted tests including, but

16

not limited to: (1) the Minnesota Multiphasic Personality Inventory ("MMPI-3") (a 335-item, objectively scored test of psychological functioning and psychopathology); (2) the Millon Clinical Multiaxial Inventory (a psychological assessment tool to provide information on personality traits and psychopathology); (3) the Static-99 (a sexual violence risk measure); or (4) the Stable-2007 (a sexual violence risk measure). Berlin chose not to administer any of these reliable assessment tools that contain internal validity checks. [7]

Instead, Berlin decided to rely solely on a convicted offender's self-reporting. Dr. Berlin readily concedes this fact, writing,                                            Berlin, *Evaluation*, at 1. While he did review the Statement of Facts, Search Warrant, and some other legal paperwork related to the case, Berlin failed to conduct any interviews or investigation to independently verify the defendant's assertions. Thus, there is no guarantee that Berlin's conclusions are even based upon accurate information. An individual that is in the defendant's position, charged with a crime and facing a significant amount of jail time is not a reliable reporter. Instead, a person in that position will be highly motivated to tailor his or her statements in such a way that will put them in the most favorable light before the Court. The choice made by Berlin to rely solely on his "professional opinion" after a single interview with the defendant is professionally suspect and the court should reject Berlin's unsupported opinions in their entirety.

Even if the court chooses to rely on the unsupported conclusions of Berlin, these conclusions do not reach the very significant question of whether the defendant will reoffend.

---

[7] The absence of any standard testing instruments mentioned in Berlin's report was confusing and alarming to the government. As a result, the government followed up with defense counsel in an effort to obtain copies of any testing mechanisms utilized, as well as the answers that the defendant provided. Defense counsel followed up on the government's request, and provided a letter from Dr Berlin who confirmed that "[t]here had been no testing done for this evaluation." Berlin, Dr. Fred, *Letter*, October 17, 2022, at 1, Gov't Ex. 2.

Berlin claims that the defendan ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *Berlin*, at 14, nor does he have a ▮▮▮▮▮▮▮▮▮▮ which, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Berlin,* at 13.  Such diagnoses do not negate either a sexual interest in children or a willingness to engage in sexual acts with children, which this defendant has demonstrated in spades.  Importantly, there is nothing about the diagnoses of ▮▮▮▮▮▮▮▮ that, in and of themselves, makes it more likely than not that someone would commit a sexual offense against a child.  A person with a ▮▮▮▮ diagnosis is capable of conforming his conduct to the law in spite of his sexual preferences.  Conversely, a person who is not clinically a ▮▮▮▮ is capable of sexually abusing a child for any number of reasons, including opportunity, boredom, or a desire to sexually gratify themselves or others.  Given how willing the defendant was to engage in sexual abuse against Minor Victim 1 after only minimal encouragement by DEFFENDANT 1, there is no guarantee that Moses would have the self-discipline to resist the direction of another dominant personality who encourages him to commit a crime in the future.

In determining an appropriate sentence, it is important to consider that, as a general matter, sex offenders have a high rate of recidivism.  *See Lombard v. United States*, 44 F. Supp. 3d 14, 26 (D.D.C. 2014) (noting that the lower court's concerns about recidivism was supported by substantial authority (citing *Smith v. Doe,* 538 U.S. 84, 103, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) ("The risk of recidivism posed by sex offenders is frightening and high.") (citations omitted); *McKune v. Lile,* 536 U.S. 24, 33, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (noting that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault"); *United States v. Irey,* 612 F.3d 1160, 1214 (11th Cir.2010) ("[T]he threat of recidivism

by a pedophile who has sexually abused a child is appalling.") (citation and quotation marks omitted); *United States v. Allison,* 447 F.3d 402, 405–06 (5th Cir.2006) ("Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders."). A sentence within the guidelines range is necessary to protect the public, including the most vulnerable members of our society, from future crimes from this defendant.

### F.  The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have been Found Guilty of Similar Conduct

Section 3553(a)(6) directs courts to consider avoiding unwarranted disparities among defendants "with similar records who have been found guilty of similar conduct." *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010). Here, a sentence of 168 months is appropriate in order to avoid an unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct.

This Court is familiar with the case of *United States v. Christopher Ham*, 21-cr-665-TNM. *See* Judgment and Conviction Order, May 17, 2022, Gov't Ex. 3.  Just like the defendant here, Ham met DEFENDANT 1 online and began a sexual relationship with her.  Similar to the facts of this case, DEFENDANT 1 invited Ham ▮▮▮▮▮▮ and offered Ham the opportunity to sexually abuse ▮▮▮▮▮▮.  Ham made the same unconscionable decision that this defendant did – he sexually assaulted the defenseless little girl while DEFENDANT 1 filmed the abuse.  The video of Ham sexually abusing the child was uploaded to DEFENDANT 1's Dropbox account, just like the video depicting the defendant's abuse of Minor Victim 1.

Just like this defendant, Ham also had no criminal history prior to the events that brought him before this Court for sentencing.  In fact, Ham had never even been arrested. Nevertheless, after correctly calculating the guidelines range and weighing the 3553(a) factors, this Court

sentenced Ham to 168 months imprisonment, and ordered Ham to pay Minor Victim 1 $100,000 in restitution.  There is no meaningful distinction between what Ham and this defendant did in terms of victimizing an innocent child.  Nor are there meaningful differences in their history and characteristics that would justify a different outcome for this defendant.  As such, a guidelines sentence in this case is necessary to prevent an unwarranted sentencing disparity.

## III.   The Child Victim is Entitled to Restitution

The United States asks the Court to order the defendant to pay restitution in the amount of $100,000 to Minor Victim 1, with payments to begin immediately.  The defendant, who is a college-educated individual making $75,000 at the time of his arrest, is one of four known individuals who participated in the sexual abuse and exploitation of Minor Victim 1.  In child pornography cases restitution is mandatory to any person "harmed as a result of" a defendant's crime pursuant to 18 U.S.C. § 2259. *See* 18 U.S.C. § 2259(a), (c); *see also United States v. Monzel*, 930 F.3d 470, 476 (D.C. Cir. 2019); *United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015) ("Pursuant to 18 U.S.C. § 2259, the victims of certain federal crimes, including possession of child pornography, are entitled to mandatory restitution.").  Restitution includes "the full amount of the victim's losses," which may include any costs incurred by the victim for:

> (A) Medical services relating to physical, psychiatric, or psychological care;
> (B) Physical and occupational therapy or rehabilitation;
> (C) Necessary transportation, temporary housing, and child care expenses;
> (D) Lost income;
> (E) Attorneys' fees, as well as other costs incurred; and
> (F) Any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(a), (b)(3); *see also United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015).

Here, a conviction for "Access with Intent to View," in violation of 18 U.S.C. 2252(a)(4)(b) and (b)(2) falls squarely under the mandatory restitution requirement of § 2259.  Thus, the court "shall" direct the defendant to pay restitution up to the full amount of Minor Victim 1's losses, and

a Court may not decline to issue an order under this section because of the economic circumstances of the defendant.  *See* 18 U.S.C. § 2259(4)(B)(i)

To assist the court in determining the restitution amount, the Court has been provided the Restitution Review and Report, prepared by ▓▓▓▓▓▓▓▓ on July 27, 2021, which was previously filed under seal.  This report itemizes the expected losses that Minor Victim 1 will face over the course of her lifetime.  *See* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ July 27, 2021, at pp. 13-18.  This report details the expected costs that this little girl is expected to incur in order to address the sexual abuse that was perpetrated by the defendant and others in both the short and long term.  ▓▓▓▓▓ calculated a total loss amount of $1,406,380.  *Id.* at 13-18.  After a review of this report, the United States requests this Court to order restitution in the amount of $100,000, a small fraction of the overall losses that Minor Victim 1 is expected to face over her lifetime.

The case of *Paroline v. United States*, 572 U.S. 434 (2014), can provide the Court some guidance in fashioning a restitution award.  In *Paroline*, the United States Supreme Court faced a circuit split over the interpretation of 18 U.S.C. § 2259, specifically over "how to determine the amount of restitution a possessor of child pornography must pay to the victim whose childhood abuse appears in the pornographic materials possessed." *Paroline*, 572 U.S. at 439.  In that case, the defendant possessed two images of the victim who was seeking restitution. The Court's answer to this question involved three steps.

First, *Paroline* held that, because the statute defined a "victim" as someone "harmed as a result" of the offense, restitution under § 2259 was proper "only to the extent the defendant's offense proximately caused a victim's losses." *Id*. at 448.  Second, the Court held that "proximate cause" under § 2259 did not require strict but-for causation.  *Id*. at 458-59.  Third, the Court

21

provided sentencing courts the following guidance for how to determine the proper amount of restitution under this standard. *Id*. The Court noted that a sentencing court's goal should be to assess "the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses," taking into account any "available evidence." *Id*. at 459-60. The Court emphasized that there is no "precise mathematical inquiry" governing this determination and that district courts must exercise "discretion and sound judgment" in fashioning restitution awards. *Id*.  The Court suggested several factors to be considered, including: (1) the number of defendants convicted of possessing the victim's images; (2) the number of future offenders likely to be caught and convicted; (3) whether the defendant had any role in the initial production of the images; (4) whether the defendant reproduced or distributed the images; (5) how many images the defendant possessed; and (6) "other facts relevant to the defendant's relative causal role." *Id*. at 460-61.  "These factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders. They should rather serve as rough guideposts for determining an amount that fits the offense." *Id*.

The principles set out in *Paroline* provide guidance to the Court in determining a fair amount of restitution. First, there can be no doubt that Minor Victim 1 was harmed by this defendant's actions. Second, the defendant, by sexually abusing the little girl, was a proximate cause of this harm.  Finally, in fashioning a restitution award, this Court should consider that the government is aware of a total of 4 individuals who sexually abused Minor Victim 1.  This includes, as detailed above,                    as well as two other known offenders. The government does not believe there will be other hands-on offenders caught and convicted in these matters.  To date, while Minor Victim 1's images have been reported to the National Center for Missing and Exploited Children, the United States is not aware of any instances in which these

child sexual abuse images have been distributed.  What is clear in this case is that this defendant played a role in the initial production of abuse images, and by sexually abusing this little girl, he had a direct causal role in the harm that she has and will suffer.  For all these reasons, a restitution award of $100,000, in light of the total expected lifetime losses of $1,406,380, is appropriate.  The United States has attached a proposed restitution order for the Court's consideration..

**IV.**   **Conclusion**

The Government submits that a Guidelines sentence of 168 months, followed by a term of lifetime supervised release, is a reasonable sentence in this case and is "sufficient, but not greater than necessary to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a).  The United States also seeks restitution in the amount of $100,000, pursuant to 18 U.S.C. § 2259, to compensate Minor Victim 1 for the substantial losses that she is expected to incur over the course of her life.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


_____/s/_____
Amy E. Larson
Jocelyn P. Bond
Assistant United States Attorneys
United States Attorney's Office for D.C.
601 D Street NW
Washington, DC 20530